ACCEPTED
01-15-00173-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
9/18/2015 1:21:52 PM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00173-CV

---

In the First Court of Appeals
Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

9/18/2015 1:21:52 PM

CHRISTOPHER A. PRINE
Clerk

---

JOAN JOHNSON, KALETA JOHNSON,
SETH JOHNSON AND WIRT BLAFFER,
*Plaintiffs/Appellants*

V.

MICHAEL PHILLIPS, SPINDLE TOP PUBLISHING CO.,
AND PHILLIPS, AKERS, WOMACK, P.C.,
*Defendants/Appellees*

---

On Appeal from The
333rd District Court of Harris County
Hon. Joseph J. "Tad" Halbach, Jr.
Trial Court Cause No. 2011-14027

---

BRIEF FOR APPELLEES

---

William W. Ogden
State Bar No. 15228500
bogden@ogblh.com
Judith A. Meyer
State Bar No. 13993200
jmeyer@ogblh.com
OGDEN, GIBSON, BROOCKS,
   LONGORIA & HALL, L.L.P.
1900 Pennzoil South Tower
Houston, Texas 77002
Telephone: 713-844-3000
Facsimile: 713-844-3030

Attorneys for Appellees

ORAL ARGUMENT REQUESTED

**IDENTITY OF PARTIES AND COUNSEL**

| PARTY | TRIAL COUNSEL | APPELLATE COUNSEL |
|---|---|---|
| Joan Johnson, Kaleta Johnson, Seth Johnson and Wirt Blaffer,     Plaintiffs/Appellants | Patrick Zummo Two Houston Center 909 Fannin, Suite 3500 Houston, Texas 77010 | Mark S. Tabolsky Yetter Coleman LLP Two Houston Center 909 Fannin, Suite 3600 Houston, Texas 77010<br><br>Patrick Zummo Two Houston Center 909 Fannin, Suite 3500 Houston, Texas 77010 |
| Michael Phillips Spindle Top Publishing Co., and Phillips Akers Womack PC     Defendants/Appellees | William W. Ogden Judith A. Meyer OGDEN, GIBSON, BROOCKS, LONGORIA & HALL, L.L.P. 1900 Pennzoil South Tower 711 Louisiana Houston, Texas 77002<br><br>Thomas M. Gregor GREGOR & RIPPY 700 Louisiana, Suite 395 Houston, Texas 77002 | William W. Ogden Judith A. Meyer OGDEN, GIBSON, BROOCKS, LONGORIA & HALL, L.L.P. 1900 Pennzoil South Tower 711 Louisiana Houston, Texas 77002 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................. i

INDEX OF AUTHORITIES ............................................................................... iv

STATEMENT OF THE CASE .............................................................................. ix

STATEMENT REGARDING ORAL ARGUMENT ....................................................... ix

ISSUES PRESENTED ..................................................................................... x

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS .................................................................................. 2

SUMMARY OF THE ARGUMENT ....................................................................... 5

ARGUMENT AND AUTHORITIES ....................................................................... 8

I.    The Book is privileged as a fair report of a public trial ................................. 8

      A.    The statutory privilege in § 73.002 applies. ........................................ 9

      B.    Since Appellees are media defendants and the Book addresses
            a public concern, Appellants have the burden of proof. .................... 12

      C.    The privilege is not self-conferred. .................................................. 14

      D.    The settlement offer does not remove the fair report privilege ......... 17

II.   Literary devices and characterizations do not make the Book
      false, nor do they prevent it from being a fair report ................................. 18

III.    Appellants do not have a valid claim for "libel as a whole" ......................... 23

    A.    This is not a proper "libel as a whole" claim. .................................... 24

    B.    Libel as a whole is based on verifiable facts
        not testimonials................................................................................. 26

    C.    Appellants ignore context................................................................. 26

IV.    The defamatory "gists" and constituent statements are substantially
    true, privileged, or not reasonably capable of the defamatory
    meaning Appellants attribute to them............................................................ 30

    A.    "Domestic Violence Gist"................................................................ 31

    B.    "Perjury and Dishonesty Gist" ......................................................... 39

    C.    "Drug and Alcohol Gist"................................................................. 45

    D.    "Parental Neglect Gist". ................................................................... 49

    E.    "Child Abuse Gist"........................................................................... 55

V.    Appellants other claims are waived............................................................. 64

CONCLUSION ............................................................................................... 65

CERTIFICATE OF COMPLIANCE ..................................................................... 66

CERTIFICATE OF SERVICE.............................................................................. 67

**Cases**

*Alpert v. Crain, Caton & James, P.C.*,
178 S.W.3d 398 (Tex.App.—Houston [1st Dist.] 2005, pet. denied)..........................17

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .................................................................................................10

*Bentley v. Bunton*,
94 S.W.3d 561 (Tex. 2002)......................................................................................26

*Bob v. Cypresswood Community Ass'n*,
_____ S.W.3d _____, 2015 WL 3423753
(Tex.App.—Houston [1st Dist.] 2015, no pet.) .........................................................65

*Brewer v. Capital Cities/ABC, Inc.*,
986 S.W.2d 636 (Tex.App.—Fort Worth 1998, no pet.).............................................50

*Cantey Hanger, LLP v. Byrd*,
2015 WL 3976267 (Tex. 2015) ................................................................................17

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005).....................................................................................27

*Computer Aid, Inc. v. Hewlett-Packard Co.*,
56 F.Supp. 2d 526 (E.D. Pa. 1999) ..........................................................................15

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975).................................................................................................12

*Craig v. Harney*,
331 U.S. 367, 374 (1947)..........................................................................................12

*Crites v. Mullins*,
697 S.W.2d 715 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.).....................9, 19

*Crumrine v. Harte-Hanks Television, Inc.*,
37 S.W.3d 124 (Tex.App.—San Antonio 2001, pet. denied) .....................................12

*Double Diamond, Inc. v. Van Tyne*,
109 S.W.3d 848 (Tex.App.—Dallas 2003, no pet.)...................................................24

*Doubleday & Co., Inc. v. Rogers*,
   674 S.W.2d 751 (Tex. 1984)................................................................................. 10

*Escobar v. Harris County*,
   442 S.W.3d 621 (Tex.App.—Houston [1st Dist.] 2014, no pet.) ............................... 65

*Falk & Mayfield, L.L.P. v. Molzan*,
   974 S.W.2d 821 (Tex.App.-Houston [14th Dist.] 1998, pet. denied)................... 50, 56

*Freedom Communications, Inc. v. Sotelo*,
   2006 WL 1644602 (Tex.App.—Eastland 2006, no pet.)............................................. 9

*Goss v. Houston Community Newspapers*,
   252 S.W.3d 652 (Tex.App.—Houston [14th Dist.] 2008, no pet.)..................... 8, 9, 20

*Granada Biosciences, Inc. v. Forbes, Inc.*,
   49 S.W.3d 610 (Tex.App.—Houston [14th Dist.] 2001)
   *rev'd on other grounds*, 124 S.W.3d 167 (Tex. 2003)................................................. 9

*Harvest House Publishers v. Local Church*,
   190 S.W.3d 204 (Tex.App.—Houston [1st Dist.] 2006, pet. denied),
   *cert. denied*, 127 S.Ct. 2987 (2007) ..................................................................... 11

*Howell v. Hecht*,
   821 S.W.2d 627 (Tex.App.—Dallas 1991, writ denied) .............................................. 8

*Huff v. Hirsch*,
   2010 WL 3294232 (Tex.App.—Houston [1st Dist.] 2010, no pet.) ........................... 17

*Hurlbut v. Gulf Atl. Life Ins. Co.*,
   749 S.W.2d 762 (Tex. 1987)................................................................................... 13

*In re J.A.J.*,
   225 S.W.3d 621 (Tex.App.—Houston [14th Dist.] 2006),
   *aff'd and rev'd in part on other grounds*, 243 S.W.3d 611 (Tex. 2007) ..................... 38

*Jacobs v. Satterwhite*,
   65 S.W.3d 653 (Tex. 2001).................................................................................... 65

*Kaufman v. Islamic Soc'y of Arlington*,
   291 S.W.3d 130 (Tex.App.—Fort Worth 2009, pet. denied) ...................................... 9

*Klentzman v. Brady*,
456 S.W.3d 239 (Tex.App.—Houston [1st Dist.] 2014, pet. filed) ............................ 13

*Langston v. Eagle Printing Co.*,
797 S.W.2d 66 (Tex.App.—Waco 1990, no writ) ........................................................ 9

*Liles v. Finstad*,
1995 WL 457260 (Tex.App.—Houston [1st Dist.] 1995, writ denied) ....................... 11

*Louis v. Mobil Chem. Co.*,
254 S.W.3d 602, 610-11 (Tex.App.—Beaumont, pet. denied) .................................. 63

*Main v. Royall*,
348 S.W.3d 381 (Tex.App.—Dallas 2011, no pet.) ................................................ 1, 10

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ................................................................................................... 10

*Maxwell v. Henry*,
815 F.Supp. 213 (S.D. Tex. 1993) ............................................................................... 9

*Metzger v. Sebek*,
892 S.W.2d 20 (Tex.App.—Houston [1st Dist.] 1994, writ denied) .......................... 18

*Mitchell v. Chapman*,
10 S.W.3d 810 (Tex.App.—Dallas 2000, pet. denied),
*cert. denied*, 531 U.S. 1152 (2001) .......................................................................... 18

*Morris v. Blanchette*,
181 S.W.3d 422 (Tex.App.—Waco 2005, no pet.) ..................................................... 26

*Neely v. Wilson*,
418 S.W.3d 52 (Tex. 2013) ........................................................................... 13, 21, 31

*New Times, Inc. v. Isaacks*,
46 S.W.3d 144 (Tex. 2004) .................................................................................. 24, 26

*Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*,
416 S.W.3d 71 (Tex.App.—Houston [1st Dist.] 2013, pet. denied) ..................... 22, 50

*Pardo v. Simmons*,
148 S.W.3d 181, 192-3 (Tex.App.—Waco 2004, no pet) ........................................... 63

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986).................................................................................13

*Raymer v. Doubleday & Co., Inc.*,
615 F.2d 241 (5th Cir. 1980) ....................................................................21

*Reagan Nat'l Advertising v. Hazen*,
2008 WL 2938823 (Tex.App.—Austin 2008, no pet.)...............................17

*Rehak Creative Services, Inc. v. Witt*,
404 S.W.3d 716 (Tex.App.—Houston [14th Dist.] 2013, pet. denied) ...........27, 49, 50

*Republic Tobacco Company v. North Atlantic Trading Company*,
381 F.3d 717 (7th Cir. 2004) ....................................................................14

*Rosenberg v. Helsinki*,
616 A2d 866 (Md. 1992), *cert. denied*, 509 U.S. 924 (1993)....................14

*Sacks v. Zimmerman*,
401 S.W.3d 336 (Tex.App.—Houston [14th Dist.] 2013, pet. denied) .......17

*Schade v. Rhodes*,
2004 WL 1355094 (Tex.App.—Houston [1st Dist.] 2004, no pet.)............18

*Striedel v. Striedel*,
15 S.W.3d 163 (Tex.App.—Corpus Christi 2000, no pet.) ........................18

*Swank v. Sverdlin*,
121 S.W.3d 785 (Tex.App.—Houston [1st Dist.] 2003, pet. denied),
*cert denied*, 544 U.S. 1033 (2005).............................................................65

*Texas Monthly, Inc. v. TransAmerican Nat'l Gas Corp.*,
7 S.W.3d 801 (Tex.App.—Houston [1st Dist.] 1999, no pet.) ........................19, 20, 34

*Traweek v. Radio Brady, Inc.*,
441 S.W.2d 240 (Tex.App.—Austin 1969, writ ref'd n.r.e.).......................9

*Turner v. KTRK Television, Inc.*,
38 S.W.3d 103 (Tex. 2000).............................................................24, 25, 26, 43

*Vecchio v. Jones*,
2013 WL 3467195 (Tex.App.—Houston [1st Dist.] 2013, no pet.)............49

vii

*Vice v. Kasprzak*,
   318 S.W.3d 1 (Tex.App.—Houston [1st Dist.] 2009, pet. denied)............................50

*Waring v. William Morrow & Co.*,
   821 F.Supp. 1188 (S.D. Tex. 1993) ........................................................................21

*Wavell v. Caller-Times Publishing Co.*,
   809 S.W.2d 633 (Tex.App.—Corpus Christi 1991, writ denied) ...............................12

## Statutes

TEX. CIV. PRAC. & REM. CODE § 22.021(3) ....................................................... 10

TEX. CIV. PRAC. & REM. CODE § 27.001(7) ...................................................... 13

TEX. CIV. PRAC. & REM. CODE § 73.002....................................................*passim*

TEX. FAMILY CODE § 151.001(a)(2)..................................................................38

TEX. PENAL CODE § 9.61(a) ............................................................................38

## Other Authorities

R. Sack, On Defamation § 7:3.5 (4th Ed. 2012)................................................ 8

RESTATEMENT 2D TORTS § 611 ......................................................................... 8

TEX. ATT'Y GEN. OP. GA-374 (2005) .............................................................. 38

## Rules

TEX. R. APP. P. 38.1(f), (i) .......................................................................... 65

## Constitutional Provisions

Article I § 8 of the Texas Constitution ............................................................9

United States Constitution, Am. 1 ..................................................................9

## STATEMENT OF THE CASE

Nature of the Case:        Claims for libel and related non-libel claims (invasion of privacy, infliction of emotional distress, theft and conversion, aiding and abetting, ratification, and injunction) all arising from publication of the book *Monster in River Oaks.* 1 CR 213.

Trial Court:        333rd District Court of Harris County
Hon. Joseph J. "Tad" Halbach presiding

Course of proceedings:        Defendants filed a Traditional and No-Evidence Motion for Summary Judgment. 2 CR 511. Plaintiffs filed a Motion for Partial Summary Judgment. 3 CR 3211.

Trial Court Disposition:        On February 9, 2015, the trial court granted the Defendants' Motion for Summary Judgment on all claims, and denied Plaintiffs' motion. 4 CR 3780.

## STATEMENT REGARDING ORAL ARGUMENT

Appellees request oral argument. While this case was resolved on summary judgment, the record is lengthy. The book at issue, *Monster in River Oaks*, is an account of a 2008 civil trial (the "Shah Trial"). The record includes a complete copy of the entire book as Joint Exhibit 1, 2d Supp. CR Vol. I, pp. 4-317, and a complete copy of the 12 Volume Reporter's Record of the Shah Trial as Joint Exhibit 2. 2d Supp. CR Vol. I p. 318- Vol. V p. 2580. Not surprisingly, the parties have sharply divergent views about the record, and there are missing pages in the clerk's record that the parties have cooperated in trying to fix. The decisional process of the Court would be aided by oral argument, to clarify any questions regarding the facts, the record or the proceedings below.

## ISSUES PRESENTED

1. Is the book privileged as a fair report of the Shah Trial?

2. Was summary judgment on the libel claims properly granted on other grounds?

    A. Are the statements substantially true?

    B. Are the statements objectively verifiable?

    C. Do the statements convey a defamatory meaning to the reasonable reader?

3. Are the non-libel claims waived by Appellants' failure to brief?

Appellees' central contention in this appeal is that the Book is privileged as a fair report of the Shah Trial. To demonstrate the point, Exhibit A to the Motion for Summary Judgment was a 70 page document listing 91 statements Appellants claimed were defamatory, divided into nine topics or "gists."[1] Following this, Exhibit B was a chart prepared by Appellees showing the Shah Trial references that supported each challenged statement.[2] Following the chart, grouped in tabs labeled B-1 through B-88, Appellees assembled the Book pages containing each challenged statement, together with record references from which the Book passage was derived.[3]

The trial court had the tedious task of sorting through 91 challenged statements and hundreds of pages of testimony in support. This was a deliberate tactic, and one that Appellants have employed before. In another libel case brought by another Blaffer descendant against a different author, using the same trial lawyer, the Dallas Court of Appeals sorted through hundreds of pages challenging 83 statements in the book. *Main v. Royall*, 348 S.W.3d 381 (Tex.App.—Dallas 2011, no pet.). That plaintiff's failure to present a clear and concise statement of the alleged defamation did not deter the Dallas Court of

---

[1] CR Vol. 2 pp. 636-707.

[2] CR Vol. 2 pp. 708-724.

[3] CR Vol. 2 pp. 725 - 3 CR 2581.

1

Appeals from rendering a defense judgment. The same tactics should not deter this Court here.

In addition to the fact that the list of challenged statements is overlong and repetitive, Appellants have misleadingly edited many passages to completely distort their context. For illustration, quotations from the Book will use **bold font** to indicate how Appellants edited the passage, and underlining to highlight the context alerting the reader that the passage is trial testimony. For example, Appellants present Statement 14 as follows: "the children suffered from neglect and physical abuse."[4] For context, this Brief quotes the Book as follows:

> Dinny's further testimony painted an increasingly bleak picture. . . . Joan, he claimed, was battling alcoholism, and **the children suffered from neglect and physical abuse.** According to Dinny, there wasn't even food in the house . . .[5]

Bold font shows the redacted fragment that Appellants challenged as defamatory. Underlining shows that the reader is alerted that this characterization comes from trial testimony.

### STATEMENT OF FACTS

This is a libel case. Defendant Michael Phillips ("Phillips") wrote *Monster in River Oaks* (the "Book"). Plaintiffs are Joan Blaffer Johnson and her three

---

[4] CR Vol. 2 p. 650.

[5] 2d Supp. CR Vol. I p. 80.

2

children: Wirt, Seth and Kaleta. Joan is a granddaughter and heiress of R. L. Blaffer, a founder of Exxon.

The Book describes how the Plaintiffs were victimized by a con man named Dinny Shah. From 1997 to 2002, Shah befriended the Plaintiffs, moved into their home, misappropriated their property, and verbally and physically abused them. The trauma ended when Shah was arrested in 2002.

The Johnsons sued Shah for assault and infliction of emotional distress. *Seth and Kaleta Johnson v. Dinesh Shah*, No. 2006-38382, 295th District Court (Hon. Tracy Christopher) (the "Shah Trial"). The Appellants' 30 page petition recounted Shah's abuse in vivid detail.[6] All four Appellants testified about their victimization by Shah. No part of the Shah Trial record was sealed.

Shah attempted (unsuccessfully) to deflect criticism by denying the charges and blaming others. The jury didn't buy it. The Book includes the author's harsh judgment that Shah was a child abuser, a thief, and a perjurer. The jury returned a $20 million verdict for the Johnsons.

Defendant Phillips was Shah's lawyer in the Shah Trial. Phillips wrote the Book based upon testimony and exhibits from the trial record. Large portions of the Book are verbatim excerpts from the transcript. Sixteen trial exhibits are reproduced in the Book's Appendix.

---

[6] CR Vol. 4 pp. 3709 – 41.

Appellants' Brief states—incorrectly—that Shah took original Johnson family documents, gave the documents to Phillips, and that Phillips used the stolen documents to write the Book. Appellants' Brief at 5-6. This is not true. While Shah lived with the Johnsons, he organized documents and financial records, and moved boxes of records to a storage unit rented in his name.[7] In the discovery phase of the Shah Trial, Shah delivered original records from his storage unit to a copy service. The copy service made copies, delivered the copies to Phillips for discovery, and returned the originals to Shah. Both Phillips and the copy service provided uncontroverted affidavits to this effect.[8] Phillips never had a key to the storage unit and has never been to the storage unit.[9] Phillips paid for his own copy of the transcript and reviewed 3,000 pages of exhibits as source material for the Book.[10]

In post-trial proceedings, Appellants moved to appoint a receiver, claiming that Shah had transferred their documents to a different storage unit maintained by his parents.[11] Joan supplied an affidavit stating that her family's records had been taken to a storage unit rented by Shah's father.[12] The receiver was appointed, and

---

[7] CR Vol. 4 p. 3712 ¶ 13; 2d. Supp. CR Vol. III pp. 1361-62.

[8] CR Vol. 3 p. 3067-68 ¶¶ 22-23, 3072-75.

[9] CR Vol. 3 p. 3068 ¶ 23.

[10] CR Vol. 3 p. 3061 ¶ 6.

[11] CR Vol. 4 p. 3748.

[12] CR Vol. 4 p. 3757.

by July 2012, the Johnsons' lawyer acknowledged that the original records were in the storage unit maintained by Shah's parents.[13]  For over three years the Johnsons have known that their records were held by the Shah family, not by Phillips.

Appellants' Brief also states—again incorrectly—that Phillips "attempted to extort $250,000 from the Johnson family." Appellants' Brief at 3.  The "extortion demand" was a pretrial settlement offer dated May 9, 2008.[14]  It was one of a series of settlement offers traded back and forth between the parties.  Before the May 9 letter, Shah offered to pay $750,000 in settlement.[15]   Three weeks later, Shah offered up to $450,000 if allowed to pay over time.[16]  Throughout this exchange, Shah maintained that the Johnsons had some of his personal property, including artwork, which was why Shah claimed compensation.[17]  All of the settlement negotiations involved returning property whose ownership was disputed.

## SUMMARY OF THE ARGUMENT

Summary judgment was proper on four grounds:  (1) the Book is protected by the fair report privilege, (2) many challenged statements are substantially true, (3) many statements are not objectively verifiable, and (4)  other statements do not convey a defamatory meaning to a reasonable reader.

---

[13] CR Vol. 4 p. 3769.

[14] CR Vol. 4 p. 3428.

[15] CR Vol. 4 p. 3706 ¶ 5.

[16] CR Vol. 4 p. 3743.

[17] CR Vol. 4 p. 3744 ¶ 3; CR Vol. 4, p. 3429 ¶ 3.

The Book is privileged as a fair report of a public trial. The fair report privilege has 3 sources: constitutional law, common law, and statute. TEX. CIV. PRAC. & REM. CODE § 73.002. Book authors are media defendants with standing to assert the statutory privilege in § 73.002. Any speaker can claim the common law and constitutional privileges.

The privilege is not self-conferred. Phillips did not initiate the Shah trial; those proceedings were filed by the Johnsons themselves. Most of the challenged statements came from the Appellants' own witnesses. All four Appellants testified about their physical and mental abuse. Appellants also called police officers and medical experts who described the abuse, and criticized Joan for not protecting her children.

Both the fair report privilege and the substantial truth defense assess the challenged statements by their impact on a reasonable reader. Statements may not be taken out of context by isolating sentence fragments. A reasonable reader understands that Appellants were victims of a crime, not perpetrators of crimes. A reasonable reader also readily understands that testimony in the Shah Trial was often sharply conflicting. In the credibility war, the Book portrays Appellants as credible and honest. It is Shah who is portrayed as an abuser and liar.

Book authors and publishers are members of the print media, and the trial court correctly found that Appellees were media defendants. Trials are public

6

events, and issues regarding law enforcement, crimes and child endangerment are all of legitimate public concern. Since the case involves claims against a media defendant on matters of public concern, Appellants had the burden of proving falsity. Appellees negated both falsity and actual malice by pointing to the many public record sources for the Book, and including much of the trial record to give the Book context.

While Appellees do not concede that the Book is embellished, both the fair report privilege and the substantial truth doctrine allow "breathing room" for an author to characterize events and use literary devices to convey impressions or descriptions to the reader. Those characterizations and descriptions do not prevent the Book from being a fair report, nor do they make the Book false.

Appellants' claims below included nine different "defamatory gists" and constituent sub-statements in their libel claim. Appellants' claims also included non-libel claims: infliction of emotional distress, conspiracy, conversion and theft, aiding and abetting, and injunction. By this appeal, Appellants only briefed five of the nine "defamatory gists" raised below. Appellants briefed none of the non-libel claims. All claims not briefed are waived.

## I. The Book is privileged as a fair report of a public trial.

Texas law protects statements that are (1) fair, true and impartial accounts of judicial proceedings, and (2) other matters of public concern published for general information. TEX. CIV. PRAC. & REM. CODE § 73.002. Since the entire Book is taken from testimony and exhibits in the Shah Trial, the privilege applies to the entire Book.

The motion below emphasized 3 grounds for the fair report privilege: statutory, common law and constitutional law.[18] The fair report privilege was recognized at common law as an exception to the republication rule. R. Sack, On Defamation § 7:3.5 (4th Ed. 2012); RESTATEMENT 2D TORTS § 611. Texas law recognizes the common law fair report privilege. *Howell v. Hecht*, 821 S.W.2d 627, 632 (Tex.App.—Dallas 1991, writ denied); *Goss v. Houston Community Newspapers*, 252 S.W.3d 652, 655 (Tex.App.—Houston [14th Dist.] 2008, no pet.). The privilege applies even if the underlying charges are untrue or defamatory. *Id.*; *Freedom Communications, Inc. v. Sotelo*, 2006 WL 1644602 * 3 (Tex.App.—Eastland 2006, no pet.). "In other words, the accuracy of the publication is determined not by comparing it to the actual facts but to the law

---

[18] CR Vol. 2 p. 535-37.

enforcement statement upon which the publication is based." *Goss*, 252 S.W.3d at 655.

The privilege also has constitutional grounds, under the First Amendment to the United States Constitution and Article I § 8 of the Texas Constitution. Where a news article is a substantially true account of court proceedings, "the First Amendment precludes attaching any liability to their publication." *Langston v. Eagle Printing Co.*, 797 S.W.2d 66, 70 (Tex.App.—Waco 1990, no writ). *See also Granada Biosciences, Inc. v. Forbes, Inc.*, 49 S.W.3d 610, 619 (Tex.App.—Houston [14th Dist.] 2001) *rev'd on other grounds*, 124 S.W.3d 167 (Tex. 2003).

Appellants' Brief does not challenge the constitutional fair report privilege.

## A. The statutory privilege in § 73.002 applies.

Appellants argued that § 73.002 is inapplicable because it only provides a privilege for "a newspaper or other periodical." To apply the privilege to one form of print media and not another would be nonsensical. The statutory privilege has been applied in Texas to all forms of print and broadcast media, including radio broadcasts, *Traweek v. Radio Brady, Inc.*, 441 S.W.2d 240 (Tex.App.—Austin 1969, writ ref'd n.r.e.), television broadcasts; *Maxwell v. Henry*, 815 F.Supp. 213 (S.D. Tex. 1993), news articles accessible by telephone; *Crites v. Mullins*, 697 S.W.2d 715 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.), and internet articles. *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 138-43

9

(Tex.App.—Fort Worth 2009, pet. denied). The question isn't whether the Book is "a newspaper or other periodical." The question is whether the term "print media" includes publishers and authors of traditional books.

Appellants argue that § 73.002 is inapplicable because Phillips is a lawyer, not a professional journalist, and the Book was self-published. Appellants' counsel made the same argument for another Blaffer descendant—and lost it—in *Main v. Royall*, 348 S.W.3d 381 (Tex.App.—Dallas 2011, no pet.). The *Royall* Court held that "authors and publishers of traditional books" are "members of the electronic or print media." *Id.* at 387. To distinguish between books and other media "would cause an inconsistent application of the statute and lead to an absurd result." *Id.*; *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (First Amendment applies to libel action against a book author and publisher); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n. 6 (1963) (free press protection "embraces the circulation of books, as well as their publication"); *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 754 (Tex. 1984) (applying First Amendment to appeal of defamation action by book author).

The Civil Practices & Remedies Code defines "news medium" to specifically include a "book publisher," or any other entity disseminating information to the public in printed form. TEX. CIV. PRAC. & REM. CODE § 22.021(3) (conferring a qualified privilege to protect sources). Other Texas

10

courts have indicated that the statutory privilege in § 73.002 is available to book publishers and authors. *Liles v. Finstad*, 1995 WL 457260 * 5-6 (Tex.App.—Houston [1st Dist.] 1995, writ denied) (not designated for publication) (assuming without holding that § 73.002 applied to book publishers). *See also*, *Harvest House Publishers v. Local Church*, 190 S.W.3d 204 (Tex.App.—Houston [1st Dist.] 2006, pet. denied), *cert. denied*, 127 S.Ct. 2987 (2007) (book publisher and author were members of "print media").

This record shows that Phillips' Book was traditionally published and edited, distributed to bookstores, and sold to the general public. The Book was edited and printed by a traditional book publisher—Brown Books Publishing Group—but was published by Spindle Top because Brown Books wanted to issue the manuscript as a screenplay.[19] Phillips paid a professional firm to edit the text, then had the manuscript vetted by two law firms and reviewed by English faculty from Southern Methodist University.[20] The Book was sold by 2 national sellers—Barnes & Noble and Borders. It was distributed on Amazon and Kindle, and marketed at Brazos Bookstore, River Oaks Bookstore, and Murder by the Book.[21] Phillips hosted traditional book signings at stores and other locations.[22] The Book

---

[19] CR Vol. 3 p. 3062-3.

[20] CR Vol. 3 p. 3061 ¶ 6, 3062 ¶ 8.

[21] CR Vol. 3 p. 3065.

[22] CR Vol. 3 p. 3066 ¶ 18.

made Amazon's Top 100 Best Sellers for 57 straight weeks, at one point reaching number 3 in the True Crime category.[23]

This is not a mere internet blog or web post. This is a traditional book that was professionally edited, marketed and distributed. The author and publisher are clearly members of the print media.

**B.    Since Appellees are media defendants and the Book addresses a public concern, Appellants have the burden of proof.**

Accounts of public trials are matters of public concern. "A trial is a public event. What transpires in the courtroom is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947). Issues of crime and law enforcement are also matters of public concern. "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public . . ." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975).

In particular, issues of child safety and child endangerment are issues of legitimate public concern as a matter of law. *Crumrine v. Harte-Hanks Television, Inc.*, 37 S.W.3d 124 (Tex.App.—San Antonio 2001, pet. denied). Facts revealed in open court are public record even if they are "seamy, sordid and violent." *Wavell v. Caller-Times Publishing Co.*, 809 S.W.2d 633, 636 (Tex.App.—Corpus Christi 1991, writ denied) (reports based on criminal prosecution and paternity action

---

[23] *Id.* ¶ 17.

arising from attorney's assault by former lover was a public concern). *See also* TEX. CIV. PRAC. & REM. CODE § 27.001(7) (Texas Citizens Participation Act), defining a "matter of public concern" to include any issue related to health, safety, or community well-being.

This case thus constitutes a libel claim against a media defendant over a matter of public concern. This shifts the burden to Appellants to prove falsity. "The United States Supreme Court and this Court long ago shifted the burden of proving the truth defense to require the Plaintiff to prove that the defamatory statements were false when the statements were made by a media defendant over a public concern." *Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013). "To ensure that true speech on matters of public concern is not deterred, we hold that the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986).

Appellants also have the burden to prove malice to overcome the fair report privilege. *Klentzman v. Brady*, 456 S.W.3d 239 (Tex.App.—Houston [1st Dist.] 2014, pet. filed); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762 (Tex. 1987).

## C.     The privilege is not self-conferred.

Appellants cite a number of cases from other jurisdictions for the proposition that the fair report privilege may not be "self-conferred" by Phillips simply reporting his own statements.  Appellants' Brief at 14-16.

This privilege is not self-conferred, and the cited cases have nothing to do with the present facts.  For example, in *Republic Tobacco Company v. North Atlantic Trading Company*, 381 F.3d 717, 732 (7th Cir. 2004), one tobacco company filed an antitrust suit against a competitor, then sent a letter describing the antitrust claims to *customers of the competitor.*  The letter was not privileged for two reasons:  first, the company had filed the antitrust complaint and thus created the very lawsuit it was "reporting" on, and second, the letter was sent to the competitor's customers to undercut their business, not to the public at large.  Phillips did not file the lawsuit in the Shah trial, and the Book was sold to the public at large.

Jurisdictions that have embraced the "self-confer" exception—and Texas is not one of them—have held that the privilege is lost "only if the defamer *illegitimately fabricated or orchestrated events* so as to appear in the privileged forum in the first place.  That is the true danger against which the self-reported statements exception must guard."  *Rosenberg v. Helsinki*, 616 A2d 866, 876 (Md. 1992), *cert. denied*, 509 U.S. 924 (1993).  (emphasis added).  *See also Computer*

14

*Aid, Inc. v. Hewlett-Packard Co.,* 56 F.Supp. 2d 526, 534 (E.D. Pa. 1999) (privilege can be lost if the defendant maliciously institutes a judicial proceeding to raise false and defamatory charges).

The "self-confer" exception, even if adopted in Texas, would not apply for three reasons. First, Phillips did not initiate the Shah Trial. The Johnsons filed suit themselves. And the Johnsons did not simply file a notice pleading; the 30 page petition describes Appellants' own abuse in lurid detail.[24] No one kept the children's names anonymous. There was no motion to seal the Shah Trial record.

Second, as defense counsel, Phillips cannot be charged with "illegitimately fabricating or maliciously orchestrating events." Conducting discovery, exchanging settlement offers and examining witnesses are legitimate acts in discharge of a lawyer's duties and are protected by attorney qualified immunity. *See* discussion *infra* at 17-18.

Third, and most significantly, the privilege isn't self-conferred because Phillips isn't quoting himself. Almost all of the challenged statements come from the Johnsons' own witnesses:

---

[24] CR Vol. 4 p. 3709 – 3741.

| Plaintiffs' Witness | Description | Reference |
|---|---|---|
| Joan Johnson | Joan admits kicking her children. | 2d Supp. CR Vol. V p. 2263-65 |
| Joan Johnson | Joan admits striking Seth in the face. | CR Vol. 3 p. 3162 |
| Kaleta Johnson | Wrote memo to Mom: no screaming, violence or kicking. | 2d Supp. CR Vol. V p. 2119:10 |
| Wirt Blaffer | Stabbing photo of his mother. | 2d Supp. CR Vol. IV p. 1999:13-16 |
| Kaleta Johnson | Throwing keychain at Seth requiring stitches in the ER. | 2d Supp. CR Vol. IV p. 2044:15-23 |
| Seth Johnson | Joan whipped Seth once or twice. | 2d Supp. CR Vol. V p. 2292:25 |
| Joan Johnson | Joan endured beatings herself and witnessed Shah beat her children "many times." | 2d Supp. CR Vol. V p. 2235-36 |
| HPD Officer Nguyen | Officer questions why Joan Johnson failed to protect her children. | 2d Supp. CR Vol. II p. 764:6-14 |
| HPD Sgt. Kenneth Bounds | Joan failed to protect her kids. | 2d Supp. CR Vol. II p. 797:6-12 |
| Dr. Victor Scarano, Plaintiffs' expert | Joan was unable to protect her children; Stockholm Syndrome. | 2d Supp. CR Vol. IV p. 1875 |
| Dr. Arthur Farley, Plaintiffs' medical Expert | Joan was "a plum to pluck," very immature. | 2d Supp. CR Vol. V p. 2357:12-18 |
| Dr. Arthur Farley, Plaintiffs' medical Expert | Kids were abused "by Mr. Shah and Mrs. Johnson." | 2d Supp. CR Vol. V p. 2380 |
| Seth Johnson | Seth was sexually abused by Shah. | 2d Supp. CR Vol. V p 2323, 2333-34 |

Many more examples could be cited, but the point is clear. The privilege is not self-conferred because most challenged statements come from the Johnsons' witnesses.

16

**D.    The settlement offer does not remove the fair report privilege.**

Appellants assert that the May 9 settlement letter was "extortion" and a "threat of defamation" suggesting an improper motive, thus invalidating the privilege.  Appellants' Brief, at 15.  This is unfounded hyperbole.

Under the doctrine of attorney qualified immunity, attorneys cannot be liable to opposing parties for actions taken in representing their client.  *Cantey Hanger, LLP v. Byrd*, 2015 WL 3976267 at * 3 (Tex. 2015). Qualified immunity applies even if the conduct is wrongful.  *Cantey*, at *3; *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex.App.—Houston [1st Dist.] 2005, pet. denied). "Fraud is not an exception to attorney immunity;" immunity applies to any acts undertaken within the lawyer's duties to his client.  *Cantey*, *supra* at * 5.

The Johnson documents were mentioned in settlement offers and were exchanged in discovery, both of which are within a lawyer's duties to his client. Aggressive settlement negotiations are "quintessentially" part of a lawyer's duties. *Reagan Nat'l Advertising v. Hazen*, 2008 WL 2938823 at * 2 (Tex.App.—Austin 2008, no pet.); *Huff v. Hirsch*, 2010 WL 3294232 at * 3 (Tex.App.—Houston [1st Dist.] 2010, no pet.).  Engaging in discovery is likewise within a lawyer's duties. An opposing party has no claim based on a lawyer aggressively seeking or resisting discovery.  *Sacks v. Zimmerman*, 401 S.W.3d 336, 342 (Tex.App.—

17

Houston [14th Dist.] 2013, pet. denied); *Mitchell v. Chapman*, 10 S.W.3d 810, 811-12 (Tex.App.—Dallas 2000, pet. denied), *cert. denied*, 531 U.S. 1152 (2001).

A reminder that documents produced in discovery could become public at trial is merely stating the obvious. Offering documents in evidence is a fundamental right of a party to litigation. *Schade v. Rhodes*, 2004 WL 1355094 at * 3 (Tex.App.—Houston [1st Dist.] 2004, no pet.); *Striedel v. Striedel*, 15 S.W.3d 163, 166 (Tex.App.—Corpus Christi 2000, no pet.). It is not extortion to argue in settlement that evidence may be embarrassing. In *Metzger v. Sebek*, 892 S.W.2d 20, 46 (Tex.App.—Houston [1st Dist.] 1994, writ denied), a father settled a divorce proceeding on unfavorable terms because his wife threatened to use evidence of his alleged sexual abuse of a child. This Court held that this was not "extortion" of a settlement.

This settlement letter occurred during litigation, arose in the midpoint of fluctuating counteroffers, and was well within Phillips' duties to his client.

## II. Literary devices and characterizations do not make the Book false, nor do they prevent it from being a fair report.

Appellants argue that the Book is not protected by the fair report privilege, because Phillips added embellishments or characterizations that defeat the privilege. Appellees do not concede that the Book exaggerates the trial, but even if it did, that would not defeat the privilege.

18

Even embellished accounts are privileged where the variance is immaterial to a reasonable reader. "The critical test is the effect on the mind of the reader or listener; if the effect on the mind of the recipient will be the same, any variance between the actions charged and the actions proved should be disregarded." *Crites v. Mullins*, 697 S.W.2d 715, 717 (Tex.App.—Corpus Christi, 1985, writ ref'd n.r.e.). In other words, the test for privilege is like the test for truth. There can be exaggerations, so long as those differences do not significantly affect the reasonable reader. "A showing of substantial truth will defeat an allegation of libel, *even where the misconduct charged may be exaggerated*, if no more opprobrium would be attached to appellant's actions merely because of such exaggeration." *Id.* at 717 (emphasis added).

A number of Texas cases have applied the fair report privilege to news accounts of trials, even where the account "greatly exaggerates a libel-plaintiff's misconduct," finding that the differences would not affect a reasonable reader. *Texas Monthly, Inc. v. TransAmerican Nat'l Gas Corp.*, 7 S.W.3d 801, 805 (Tex.App.—Houston [1st Dist.] 1999, no pet.). Examples of privileged statements in *TransAmerican* are informative. The article said the plaintiff had "wiretapped the phones of employees." The plaintiff argued that "wiretap" connoted a criminal intercept, whereas the employer's recording of workplace conversations was legal. This Court described "wiretap" as "a literary device to grab the reader's attention,"

19

*Id.* at 80, and held it was not sufficiently exaggerated to eliminate the privilege. Similarly, the article reported that a former employee had "quit as a matter of conscience" and accused the plaintiff's CEO of "cooking the books." The former employee denied saying that he quit as a matter of conscience, and the plaintiff argued that this conveyed a sense of revulsion that exaggerated the misconduct of plaintiff's managers. The CEO denied using the phrase "cook the books." This Court still held the news account privileged, despite the fact that the author's characterizations did not flow literally from the trial record.

To the same effect, a report that the plaintiff had been arrested for drag racing and possession of controlled substances was held to be a fair and impartial account of legal proceedings, even though (1) the plaintiff was never charged with racing, (2) he had a prescription for the alleged controlled substance, and (3) the controlled substance charge was later dismissed, and his arrest record expunged. *Goss v. Houston Community Newspapers*, 252 S.W.3d 652, 655-56 (Tex.App.— Houston [14th Dist.] 2008, no pet.).

Just as an author's original word choice does not negate privilege, exaggerations or literary devices used "to grab the reader's attention" do not establish falsity. Thus, in the book *Blood and Money*, another Houston-based "true crime" book about the murders of Dr. John and Joan Hill, Tommy Thompson's description of a police officer as "a hard-boiled egg" who was "well

20

accommodated to the fact that he had made but slight scratches on the face of the earth" were held to be nonactionable characterizations that would be perfectly understood by a reasonable reader. *Raymer v. Doubleday & Co., Inc.*, 615 F.2d 241, 243 (5th Cir. 1980). These characterizations were "merely a literary description of the author's impression designed to create for the reader an immediate mental picture of the character." *Id.* The author's speculation, in which officer Raymer looks at a waitress and imagines, "these old boys swap these girls back and forth like used cars," would not be understood by a reasonable reader to impute sexual misconduct to the plaintiff. *Id.* at 244. In another Houston-based true crime novel, the book *Sleeping with the Devil* was held to be substantially true despite the author's characterization of the plaintiff as falling within a class of "informants, snitches, contacts . . . cultivated in the shadows of the night." *Waring v. William Morrow & Co.*, 821 F.Supp. 1188 (S.D. Tex. 1993). The plaintiff argued that this characterization was not based on any official record, and made him appear scurrilous and disreputable. The court nonetheless held the book to be a substantially true account. The plaintiff, in fact, had been a confidential informant on a plot to murder Houston model Barbara Piotrowski.

Texas privilege law was not changed by the Supreme Court's decision in *Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013). A recent decision from this Court, re-issued on rehearing after *Neely*, illustrates that authors still have "breathing

21

room" to employ characterizations and descriptions. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71 (Tex.App.—Houston [1st Dist.] 2013, pet. denied). In *Crazy Hotel*, articles concerning investigations at an assisted living facility were protected as a fair report, despite the plaintiff's claims that the articles were exaggerated. In each case, this Court found that the author's embellishments did not defeat the privilege:

- *Abuse.* The newspaper reported that a nurse had verbally abused and threatened a resident when he refused his medication. The Court agreed that elder abuse was "a strong choice of words," but concluded that the newspaper "could accurately characterize the conduct found by the report as 'elder abuse'." *Id.* at 84, 86.

- *Eviction Notice.* The Hotel complained that the article erroneously reported that the facility had served "eviction notices" on residents. The Hotel's letter did not mention eviction. Again, the colorful language did not remove the privilege: "while Miller and the Hotel object to the use of the term 'eviction notice' to describe the letter's effect on residents . . . the characterization reasonably describes one possible view of the letter's contents." *Id.* at 85.

- *Cascading Leaks.* The newspaper reported that the facility had leaks causing water to "cascade" into the building. The record showed minor roof leaks in the dining room. Again, the author's word choice did not eliminate the privilege: "The Index's immoderate—in the Hotel's view—word choice does not present a *prima facie* case that the descriptions, viewed in context, are less than substantially true." *Id.* at 85.

22

Again, Appellees do not concede that the Book mischaracterizes anything about the Shah Trial. But as these cases indicate, literary devices and word choices are insufficient to create fact issues on falsity or privilege.

## III. Appellants do not have a valid claim for "libel as a whole."

Appellants claim that the entire Book is libelous "as a whole." They attempt to construe statements in the prologue, on the dust jacket, or testimonials on the cover as "admissions" of a defamatory gist, such as the following:

- "Not since *Blood and Money* have such secrets of passion and possession been revealed about the residents of Houston's River Oaks neighborhood . . ."

- "An intriguing story for the student of human weaknesses and the reader who relishes insight into the forbidden secrets of the fabulously rich."

- "In some ways, this Book is a love story as well as a monster story. A story of a predatory monster that set out to control and then dominate a famous Houston family . . . It is a story of love offered but not returned. Of love needed but not offered."[25]

In these passages, both context and wording leave no doubt that these are unverifiable opinions. When the Book is read as a whole, rather than in isolated fragments, the reasonable reader gets the point that the author discredits Shah and endorses the Plaintiffs' testimony as more credible. But first and foremost, this claim does not correctly apply Texas law on libel as a whole.

---

[25] Appellants' Brief at 23 – 24.

**A.    This is not a proper "libel as a whole" claim.**

The theory of libel as a whole was set forth by the Texas Supreme Court in *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000). In *Turner*, the Supreme Court held that a plaintiff can prevail when discrete facts, literally or substantially true, are published so as to create a false and defamatory impression, either by omitting key facts or juxtaposing facts in a misleading way. *Id.* at 115. Importantly, the requirement to prove falsity and defamatory meaning "depends on a reasonable person's perception of the ***entirety of the publication*** and not merely on individual statements." *Id*. (emphasis added).

This hypothetical reasonable reader "is no dullard. He or she does not represent the lowest common denominator, but reasonable intelligence and learning." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004). Thus, sharp or biting parody is not defamatory, because the reasonable reader can "get the joke." *Id.* "Opinionated criticism" is not necessarily defamatory. *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 855 (Tex.App.—Dallas 2003, no pet.). When given the entire context, a reader of reasonable intelligence can tell the difference between factual charges of defamatory conduct on the one hand, and literary devices or testimonials used "to grab the reader's attention" on the other. *TransAmerican,* 7 S.W.3d at 807.

24

The *Turner* example is illustrative. The *Turner* broadcast reported that lawyer Sylvester Turner had his "mutual friend" Dwight Thomas appointed as administrator of an estate, and only abandoned his "pursuit" of the estate when the judge removed him for "conflicts of interest." *Id.* at 118. One material omitted fact was that Thomas was appointed executor in the decedent's will. Without knowing that Thomas was named as executor, the broadcast suggested that Turner abused his position by handpicking a friend to handle a valuable estate. Turner's "pursuit" involved collecting a life insurance policy, but the broadcast failed to report that the beneficiary of the policy was the decedent's father, not Turner or Thomas. And the only "conflict" leading to Turner's disqualification was his dual role as a lawyer and fact witness. A reasonable reader could have the misleading and the mistaken impression that the "conflict of interest" involved Turner pursuing his own pecuniary interests to the estate's detriment.

By comparison, this "libel as a whole" claim plainly falls short. *Turner* considered the entire broadcast; Appellants argue libel as a whole based on heavily redacted statements taken from the Book cover and prologue, assuming the reader will ignore the more detailed and explanatory record inside. *Turner* pointed to specific omitted facts that made the entire broadcast misleading; these Appellants cite to characterizations they describe as "salacious and scandalous," despite the

25

fact that the reasonable reader understands those characterizations are unverifiable descriptions of conflicting trial testimony.

**B.      Libel as a whole is based on verifiable facts, not testimonials.**

Libel must be based on false statements of fact which are "objectively verifiable." *Morris v. Blanchette*, 181 S.W.3d 422, 424 (Tex.App.—Waco 2005, no pet.). Texas law "focuses the analysis on the statement's verifiability and the entire context in which it was made." *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). The challenged statements on the dust jacket and prologue are clearly unverifiable. Whether the story is "intriguing," whether it concerns "human weaknesses" or "forbidden secrets" are descriptions that cannot be proven true or false. The reasonable reader understands that reviews on a dust jacket are the opinions of the reviewer, design to promote interest and draw a reader's attention to the full story within. There is no exhibit, no testimony, no quantum of proof that can verifiably establish that the Book is "stark," "powerful," "tragic," "scandalous," or "epic."

**C.      Appellants ignore context.**

Again, *Turner* instructs that defamatory meanings are determined by the entire statement as a whole, not by isolated statements or "piecemeal excerpts." *Turner*, 38 S.W.3d at 115. Context is important. *Id.; Isaacks*, 146 S.W.3d at 154-5. "[P]ublications alleged to be defamatory must be viewed as a whole—including

26

accompanying statements, headlines, pictures, and the general tenor and reputation of the sources itself." *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005); *Rehak Creative Services, Inc. v. Witt*, 404 S.W.3d 716, 729 (Tex.App.—Houston [14th Dist.] 2013, pet. denied).

This is the most glaring and recurrent problem with all of Appellants' arguments. Portions of testimony, and parts of sentences, are completely removed from the context in which the reasonable reader sees them. For example, Appellants claim that Statement 14 accuses them of child abuse: "the children suffered from neglect and physical abuse."[26] But the context in which this eight word fragment appears reads in the Book as follows:

> "Dinny's further testimony painted an increasingly bleak picture. The plumbing, according to his 2008 testimony, was in such disrepair that there were no working bathrooms in the house in 1996. The children, he said, were bathing in the backyard pool . . . Joan, he claimed, was battling alcoholism, **and the children suffered from neglect and physical abuse**. According to Dinny, there wasn't even food in the house for the children to eat—all of this happening in the wealthiest neighborhood in Houston.
>
> The Johnson family, of course, would deny these assertions in the 2008 civil trial.[27]

The Johnsons' rebuttal of Shah's testimony, including Kaleta's characterization that Shah's claims were "absolutely ridiculous," immediately follows the passage quoted above. The reasonable reader is not fooled. The context makes it clear that

---

[26] CR Vol. 2 p. 650.

[27] 2d Supp. CR Vol I p. 80.

Phillips is describing *conflicting* trial testimony—the surrounding paragraph makes reference to trial testimony 6 times.

Appellants ignore context in a broader and more meaningful way. The Book consistently endorses the Johnsons' testimony as more truthful than that of Shah:

- "Some of Dinny's more outrageous claims about the Johnson children were easily discredited."[28]

- "David Gillis, who directly contradicted Dinny for no apparent reason other than to tell the truth, exposed Dinny quite publicly as a liar."[29]

- "Dinny had perjured himself too many times. No one would believe him over the young Seth Johnson."[30]

- "Anyone who knew Dinny Shah knew exactly what to expect from him during the trial: Denial. Rage. Convenient memory lapse. Falsehoods. Rabbit trails."[31]

- "It is no big secret that Dinny Shah was a habitual liar. . . . Over the years, Dinny's lies would become more and more outrageous."[32]

When the reasonable reader reads the *entire* Book, not just the dust jacket, he or she sees Shah as a "predator,"[33] a "manipulator" and "physically violent,"[34] a

---

[28] 2d Supp. CR Vol I p. 83.

[29] 2d Supp. CR Vol I p. 210.

[30] 2d Supp. CR Vol I p. 286.

[31] 2d Supp. CR Vol I p. 274.

[32] 2d Supp. CR Vol I p. 117.

[33] 2d Supp. CR Vol I p. 106.

[34] 2d Supp. CR Vol I p. 56.

"white collar thug"[35] with an "uncanny ability to lie."[36]

By contrast, the Book describes Appellants as more credible, more impressive, and morally superior:

- "Kaleta would be a powerful witness. . . . To the jury, here was a girl who had her head screwed on right. . . . In the eyes of a jury, the acid test is the impression by the litigants themselves. Kaleta passed the acid test."[37]

- "Though eighteen people testified against Dinny, painting him as a liar, manipulator, and a fraud, it was the children's emotional testimony—particularly Seth's—that would prove most damning."[38]

- "Sgt. Bounds believes that Joan Johnson and the others he has spoken to are credible people, and he also believes that these other allegations merit follow up investigation."[39]

- "Wirt Johnson set out to expose Dinny to be the lying, manipulative snake Wirt believed him to be."[40]

- "By any criteria, Seth made a very impressive witness.[41]

- "[R. L. Blaffer] would be enormously proud of his great-grandson and great-granddaughter."[42]

---

[35] 2d Supp. CR Vol I p. 68.

[36] 2d Supp. CR Vol I p. 118.

[37] 2d Supp. CR Vol I p. 280.

[38] 2d Supp. CR Vol I p. 274.

[39] 2d Supp. CR Vol I p. 268.

[40] 2d Supp. CR Vol I p. 205.

[41] 2d Supp. CR Vol I p. 281.

[42] 2d Supp. CR Vol I p. 287.

These passages repeatedly hammer home the Book's essential premise. Shah is a "monster" whose testimony is "perjured" and who can never be believed. But the Johnsons are impressive and powerful witnesses, survivors of a horrible ordeal whose testimony is sympathetic and compelling. When read in context, and as understood by a reader of reasonable intelligence, this Book does not reach the level of a *Turner* claim for libel as a whole.

**IV. The defamatory "gists" and constituent statements are substantially true, privileged, or not reasonably capable of the defamatory meaning Appellants attribute to them.**

At trial, the Johnsons listed 91 passages claimed to be defamatory, grouped into nine "defamatory gists."[43] To establish privilege, Phillips' Motion for Summary Judgment incorporated a chart linking each challenged statement to testimony or exhibits from the Shah Trial.[44] Following the chart, each passage from the Book was copied, with trial testimony in support, tabbed as <u>Exhibits B1 to B88</u>.[45] Since space limitations make it impossible to brief every statement, Appellees refer the Court to the chart and attachments to show that all of the statements are true and privileged.

---

[43] CR Vol. 2 p. 636.

[44] CR Vol. 2 p. 708-724.

[45] CR Vol. 2 p. 725 – CR Vol. 3 p. 2567.

## A.     "Domestic Violence Gist."

The Johnsons listed 19 statements that they claim convey a Domestic Violence Gist. In most cases, the statements are not reasonably capable of the defamatory meaning that Appellants attribute to them. Other statements are substantially true. But in every case, the statements are privileged as a fair report of the trial record.

### (1)     Fair report privilege.

Statement 1 is taken from page 68 of the book.[46] This statement describes Shah's testimony that Joan and her children fought frequently. This passage is clearly "identifiable by the ordinary reader as statements that were made in the proceeding," *Neely, supra,* 418 S.W.3d at 68, since Shah's testimony is referenced 5 times. Shah did testify that Joan and her daughter fought "50 plus times."[47] He described Kaleta as "a very mean spirited little girl at that time,"[48] and testified that Joan and the children often kicked each other.[49] Shah testified that the fighting was "constant" and very physical, not normal childish fighting.[50] This account is immediately followed by Statement 2, describing the incident where Kaleta threw

---

[46] 2d Supp. CR Vol. I p. 87.

[47] 2d Supp. CR Vol. III p. 1202:17-24.

[48] 2d Supp. CR Vol. III p. 1458:16-20.

[49] 2d Supp. CR Vol. III p. 1366:18-19.

[50] 2d Supp. CR Vol. III p. 1458:16-20.

a keychain at Seth causing a cut over his eye requiring stitches.[51]  This too is a direct account of Kaleta's trial testimony.[52]

Statements 3 and 4 reprise Shah's testimony that Kaleta was "mean spirited," had tantrums and had been disciplined at school.[53]  Shah's testimony is accurately described and referenced for the reasonable reader.  Shah did describe Kaleta as mean spirited.[54]  Shah did testify that Kaleta threw a tantrum at a bookstore when he wouldn't buy what she wanted.[55]  The trial evidence included records of Kaleta's school disciplinary problems.[56]

Again, the tedious process of linking each statement to the trial record would make this Brief prohibitively long.  But a few examples merit attention.  Statement 5, for example, claims that the Book says Kaleta required "anger management classes."[57]  The Book says no such thing.  This reference quotes Shah's plea bargain, introduced in the trial record as Plaintiff's Exhibit 2.[58]  Paragraph 26 of

---

[51] 2d Supp. CR Vol. I p. 87.

[52] 2d Supp. CR, Vol. IV p. 2044:15-23.

[53] 2d Supp. CR Vol. I p. 86-88, 107.

[54] 2d Supp. CR Vol. III p. 1458:16-20.

[55] 2d Supp. CR Vol. IV p. 1573-74.

[56] CR Vol. 3 p. 2063-2071.

[57] CR Vol. 2 p. 646.

[58] CR Vol. 3 p. 2607.

the plea obligates Shah to "participate in an anger management treatment program."[59]  It is <u>Shah</u>, not Kaleta, who was ordered to anger management class.

As shown above, Statement 14—"the children suffered from neglect and physical abuse"—completely ignores the context, which attributes the statement to Shah's testimony no less than six times in the surrounding text.  *Supra*, at 27.  In yet another example of distorted context, Appellants challenged Statement 13: "over the past several years, Child Protective Services had been called out to the Johnson home to investigate claims of child abuse."[60]  Here too, the charge ignores context:

> <u>Dinny claims</u> that he and Mrs. Johnson then invited the officer inside. <u>He also alleges</u> that he was pulled aside and arrested without being allowed to tell his side of the story.  <u>According to Dinny</u>, Johnson pointed an accusatory finger at him, and the Houston police officers believed her without any evidence.  <u>He described</u> the police officer that night as acting out of jealousy over Mrs. Johnson's expensive home, with a hunger to make an arrest for Kaleta's abuse; **over the past several years, Child Protective Services had been called out to the Johnson home to investigate claims of child abuse.**
>
> <u>Yet as different as Dinny's and Joan's stories are</u>, there is one fact that all parties agree on:  Dinny was booked into the Harris County Central Jail on Reisner Street that night, charged with injury to a child.[61]

The Book alerts the reader *five times* that the author is describing Shah's trial testimony.   Appellants apparently contend that the phrase regarding Child

---

[59] CR Vol. 2 p. 762 ¶ 26; CR Vol. 3 p. 2611.

[60] CR Vol. 2 p. 650.

[61] 2d Supp. CR Vol. I p. 27 (Book p. 8).

Protective Services is not a fair report because it is not immediately followed by attribution, such as "Shah testified." The same argument was rejected in *TransAmerican*, where the last sentence in a paragraph was not attributed to the witness Stone, but attributions such as "Stone said" appeared repeatedly throughout the adjacent text. *TransAmerican*, *supra,* 416 S.W.3d at 810. This Court recognized that attribution need not be repeated in every sentence to clearly convey the trial testimony to the reasonable reader:

> Plaintiffs complain that this statement is not attributed to Stone and therefore not privileged. We disagree. The paragraph containing the statement has seven references to the fact that it was describing Stone's testimony. We believe an ordinary reader would recognize that the sentence at issue was clearly referring to Stone's testimony. Therefore, the privilege afforded in section 73.002 applies.

7 S.W.3d at 810. Shah did in fact testify that Child Protective Services had twice come to the Johnson house.[62] Joan testified about a CPS investigator who came to interview the family,[63] and exhibits show she consulted two law firms about CPS investigations.[64]

In each case, these passages accurately summarize the trial record, and are identifiable to the reasonable reader as a reference to trial testimony.

---

[62] 2d Supp. CR Vol. IV p. 1575-76.

[63] 2d Supp. CR Vol. V p. 2197; CR Vol. 3 p. 3124:12-15.

[64] CR Vol. 2 p. 974-80.

34

### (2) Not substantially false.

Other statements describing conflicts in the Johnson home were substantially true. For example, Statement 16 includes the Book's account that Joan occasionally kicked her children. This is an accurate of account of Joan's testimony:

Q. You had kicked Kaleta, true?

A. [Joan] I have kicked her, yes.[65]

Joan then elaborated that she "never kicked the children as hard as I could," not sufficiently hard to leave marks, and that she never wore boots or hard shoes: "You normally wear flip flops or tennis shoes."[66] In a protective order hearing, Joan again admitted kicking her children:

Q. So just for the record, you have kicked both Seth and Kaleta,
your son and daughter, Correct?

A. [Joan] Yes.[67]

Joan admitted hitting her son Seth in the face, but claimed the event happened years before a CPS investigator came to her home.[68]

The children's testimony also admitted that many of the described physical confrontations were true. As set forth above, Kaleta admits cutting Seth in a fight

---

[65] 2d Supp. CR Vol. V p. 2263:22-3.

[66] 2d Supp. CR Vol. V p. 2265:11.

[67] CR Vol. 3 pp. 3127-28.

[68] CR Vol. 3 p. 3162:6-9.

causing an emergency room trip to get stitches.[69] Seth admitted that his mother had whipped him "maybe once or twice."[70] Joan described a fight where Wirt threw Seth to the ground with sufficient force to cause a back injury.[71] In an application to have Wirt admitted to boarding school, Joan wrote of her fear of Wirt's violence: "I feel Wirt will kill me in the future if something is not done."[72]

Appellants challenge the Book's description of the "Things for Mom to Work On" memo written when Kaleta and Seth were children. The memo was a trial exhibit: "Things for Mom to Work On: (1) don't scream (2) no violence/kicking."[73] Kaleta admitted writing the memo, but claimed she could not recall the circumstances.[74]

Appellants challenged Statement 9, referring to the passage where Wirt kicked Joan's car. Joan corroborated the incident both in a letter and in Wirt's application to boarding school.[75] Wirt admitted kicking the car, but denied that there was much damage.[76] Statement 10 referred to the passage where Wirt stabbed a photograph of his mother into the back door of the house. Joan

---

[69] 2d Supp. CR Vol. IV p. 2044:15-23.

[70] 2d Supp. CR Vol. V p. 2292:25.

[71] CR Vol. 3 p. 2850.

[72] CR Vol. 2 p. 1137.

[73] CR Vol. 3 p. 2835.

[74] 2d Supp. CR Vol. V p. 2119:1-15.

[75] CR Vol. 3 p. 2848; CR Vol. 2 p. 1129, 1137.

[76] 2d Supp. CR Vol. IV p. 1992:10-18.

described the stabbed photograph and said it frightened her.[77]  Wirt admitted that he had done it:

> Q.  Do you remember putting a photograph of your mom on the back door with either a screwdriver or a knife stabbed in the middle of it?
>
> A.  Yes. . . .[78]

Statement 6 referred to a passage where Kaleta injured Seth's pet rat.  Kaleta admitted hurting the rat but claimed it was an accident.[79]  Shah testified that it was intentional.[80]

In sum, Appellants admitted many of the "domestic violence" statements were true.

### (3)  The reasonable reader.

Finally, even though Joan has admitted using corporal punishment on her children in the past, no reasonable reader would understand the Book as formally charging Joan with committing the felony of child endangerment.  To the contrary, the Book repeatedly describes Joan's grief and vulnerability, and sympathetically explains her actions under adverse circumstances.  The reasonable reader knows

---

[77] CR Vol. 3 p. 2851.

[78] 2d Supp. CR Vol. IV p. 1999:13-16.

[79] 2d Supp. CR Vol V p. 2116:13-24.

[80] 2d Supp. CR Vol. III p. 1457:16-24.

37

that Joan is no felon; rather, and as she admitted, she is simply a woman who sometimes "loses her cool as a mom."[81]

The Penal Code itself authorizes a parent's use of force "when and to the degree the actor reasonably believes the force is necessary to discipline the child." TEX. PENAL CODE § 9.61(a). The Family Code likewise recognizes a parent's right to administer corporal punishment. TEX. FAMILY CODE § 151.001(a)(2); TEX. ATT'Y GEN. OP. GA-374 (2005). Even corporal punishment that leaves visible marks does not necessarily constitute child abuse. *In re J.A.J.*, 225 S.W.3d 621, 631 (Tex.App.—Houston [14th Dist.] 2006), *aff'd and rev'd in part on other grounds*, 243 S.W.3d 611 (Tex. 2007). As the Fourteenth Court noted: "At least 90 percent of American parents have used corporal punishment at some time in rearing their children." *Id*. at 629.

The Trial Court correctly granted summary judgment. These statements are fair accounts of conflicting trial testimony, and readily identifiable to the reasonable reader as such. In addition, many of the challenged statements were admitted by the Johnsons to be substantially true. Finally, in the full context of the Book, the reasonable reader gets the point that the Johnsons were *victims* of a crime, not perpetrators of crimes.

---

[81] CR Vol. 3 p. 3128:2-4.

### B. "Perjury and Dishonesty Gist."

The Johnsons challenge eight passages they claim convey a defamatory gist of perjury:  statements that the children "side-stepped" questions about fights, or that the defense team "went in circles" trying to question the children, or that Wirt was "manipulative."[82]  These claims mischaracterize the text.  The Book never called the Johnsons liars; to the contrary, the Book repeatedly makes the case that Shah is the liar:  "Dinny had perjured himself too many times.  No one would believe him over the young Seth Johnson."[83]  Read in context, these statements are understood by the reasonable reader to be conflicting accounts of emotional testimony.  It is readily understandable that the abused and the abuser would recount these events differently.

The Trial Court properly granted summary judgment for three reasons: these statements are often not verifiable facts, they are privileged as a fair report, and the Appellants' spin completely ignores the context that is readily apparent to a reasonable reader.

### (1) Not objectively verifiable.

A characterization that a statement "begs credulity," or that a witness "side-steps" a question or was "manipulative," are all opinions rather than objectively verifiable facts.  An answer may seem like a side-step to one listener, yet a

---

[82] Statements 21, 22, 25.

[83] 2d Supp. CR Vol. I p. 286.

reasonable explanation to another. No reasonable reader would interpret these characterizations as a verifiable accusation of the crime of perjury. For example, the complete context of the statement describing Wirt as "manipulative" (Statement 45) reads as follows:

> Perhaps this was a jealous invention of a cunning sixteen year old who wanted David and Dinny out of the Johnsons' lives. Like any teenager, **Wirt could be manipulative**; it also goes without saying that he probably resented the men's new role as disciplinarians in the Johnson household.[84]

This is not an accusation of perjury. Wirt's manipulation is akin to that of "any teenager," and as the Book makes clear, Wirt's desire to rid the household of Shah is well-placed and clearly justified.

### (2) Fair report.

It is certainly fair comment to say that the children "side-stepped" questions about fighting, and that the defense team "went in circles" when they questioned Seth or Kaleta about the fights. Kaleta's testimony went in part as follows:

Q.    [By Mr. Phillips]  How have you fought with your mother?

A.    [Kaleta Johnson]  Verbally.

Q.    And—but you never had any physical contact with her whereby she would, like this exhibit here says, she would kick you? You've never—you had that experience, have you?

A.    **I don't ever remember her kicking me.**
. . .

---

[84] 2d Supp. CR Vol. I p. 164-5.

40

Q. Did your mother have a habit of kicking you and Seth on frequent occasions?

A. I've answered your question. **I don't remember being kicked by her.**[85]

It is at least curious that a child would "not remember" being kicked by her own mother. Seth's testimony was likewise evasive. When asked whether Shah had told Seth to lie to the CPS, or whether in fact Seth had been struck by his mother, Seth replied in part as follows:

Q. I guess I am asking you this: It's true, is it not, that Mr. Shah didn't tell you a thing? Your mother slapped you, you went to school, you told the truth.

A. [Seth] **That first statement is false.**[86]

The lawyer's first statement is that Shah did not tell Seth to lie. The second statement is that Joan struck Seth. Seth's answer indicates only the first statement is false. At one point, Seth admitted being "whipped" by his mother once or twice.[87]

Similarly, the Book's characterization of Wirt as "manipulative" is a fair report. Several witnesses testified Wirt pressured Joan to buy him a new car, to

---

[85] 2d Supp. CR Vol. V p. 2124:7-25.

[86] 2d Supp. CR Vol V p. 2330:14-17.

[87] 2d Supp. CR Vol V p. 2292:24-2293:1.

41

refurbish his garage apartment, and to throw large parties for his friends.[88] Joan

described Wirt as manipulative in her own words:

> My son, Wirt Johnson, contrary to his own belief, knows precisely why he was sent to Rocky Mountain Academy. . . . **His attempts to manipulate me** and the staff of Rocky Mountain Academy and, furthermore, to deny knowledge of why he was placed there, demonstrates his shrewd nature.[89]

Likewise, the passage in which Seth shows David Collie Joan's diary (Statement

26) is corroborated by Mr. Collie's testimony:

> Q.   Tell me about Seth's showing you the diary?
> . . .
> A.   [Mr. Collie]  I was talking to Kaleta.  Seth said, "Dave, come here, come here."  I said, "Okay."  I walked into Joan's bedroom.  He said, "Look."  I went.  I couldn't believe it.  I went downstairs and showed it [the diary] to Shah.[90]

Appellants claim this statement accuses Seth of theft.  The very passage describes

Seth's discovery of his mother's diary as the by-product of "the mischievous

curiosity of the ten year old he was."[91]  No sane reader would interpret this passage

as a verifiable accusation of perjury or theft.

Likewise, the challenged statement concerning "Joan teaching Seth to lie

and steal" (Statement 27) also ignores context.  This passage is clearly quoting the

---

[88] 2d Supp. CR Vol III p. 1417:8-13; p. 1420:7-1422:3; CR Vol. 3 p. 2847-51.

[89] CR Vol. 3 p. 2847.

[90] 2d Supp. CR Vol. IV p. 1931:21-1932:2.

[91] 2d Supp. CR Vol. I p. 170.

testimony of David Collie.[92] Collie was describing an incident in which Seth took a Game Boy toy from another student's backpack. When Joan discovered it, she instructed Seth to secretly return the Game Boy, but not to confess. Collie testified that this incident caused him to reconsider his relationship with Joan:

> Q. The relationship, the romance, cooled at some point after about six months. Is that fair to say?
>
> A. [Mr. Collie] I can't—I remember when it cooled. It cooled when, after the Seth incident with the Game Boy when **Joan was teaching Seth to lie and steal**.
>
> …
>
> Q. And the reason you decided to cool it was because you thought Joan was setting a bad example with Seth?
>
> A. That is correct.[93]

All of these statements are understood by the reasonable reader to be reports of conflicting trial testimony, and the reports are accurate.

### (3) Mischaracterizations/ignoring context.

It bears repeating that in these passages, as in many others, context is critical. Defamatory meaning is determined by looking at the entire statement as a whole, not piecemeal sections. *Turner*, 38 S.W.3d at 115. All of the "perjury/dishonesty" statements completely mischaracterize the Book and ignore the context.

---

[92] 2d Supp. CR Vol. I p. 180.

[93] 2d Supp. CR Vol. IV p. 1891:2-13.

For example, the Johnsons claim that the Book charges them with perjury when it characterizes the claims against Shah as "exaggerated" (Statement 24). The context makes clear that this passage is describing the defense attorney's *closing argument*:

> Lead counsel for the defense—Michael Phillips—<u>summed it up as best he could, given the circumstances</u>. . . . **The accusations against Dinny were exaggerated**, <u>he would argue</u>, in order to deflect jury attention from Joan's failure to blow the whistle, to resort to the legions of lawyers who looked after her millions, to respond to helpful neighbors.[94]

Every reader knows that a lawyer's closing argument will try to put the Defendant's case in the most favorable light. No one would take this passage as a literal accusation of perjury. Especially since the Book, in the two pages immediately following, reports that the jury rejected the Defendant's arguments and returned a $20 million plaintiff's verdict.

Similar disregard for context occurs in the passage describing as "suspect" Joan and Wirt's testimony about a private investigator named David Gillis (Statement 23). The question was who had hired Gillis to investigate Wirt. Shah claimed that Joan hired Gillis; Appellants claimed that Shah did. The complete passage reads as follows:

> On the stand, David <u>Gillis proved to be a reliable witness, directly contradicting everything Dinny said</u>.
> Attorney:  Isn't it true that Shah was a client of yours at some point?

---

[94] 2d Supp. CR Vol. I p. 291.

David Gillis: It is.

. . .

<u>Gillis affirmed for the Court that it was Dinny</u>—not Joan Johnson—
who hired Gillis to tail Wirt. . . .

[Gillis's] <u>testimony was a valuable victory</u> for the Plaintiffs. **Joan
and Wirt's testimony** concerning the private investigator reports that
Dinny had ordered **had been suspect**; **they both had a vested
interest in making themselves look good in front of the jury.** But
David <u>Gillis</u>, who directly contradicted Dinny for no apparent reason
other than to tell the truth, <u>exposed Dinny quite publicly as a liar</u>.[95]

Context makes this perfectly clear. It is Shah, not the Johnsons, who perjured

himself.

## C. "Drug and Alcohol Gists."

Appellants challenge five statements (Statements 28 – 32) as false

accusations of drug or alcohol abuse. Again, this mischaracterizes the text and

ignores context, and these passages, like many others, are a fair report of the trial

record.

### (1) Ignoring context.

Appellants challenge Statement 28 as an accusation that Wirt was an

alcoholic. This passage includes a paraphrase that "Wirt's attention turned to

booze" and that Wirt "continued to drink heavily," but the context makes clear that

this paraphrase occurred in the middle of Shah's self-serving testimony.

Immediately preceding these descriptions, the Book alerts the reader four times

that the author is describing Shah's testimony: "Dinny testified" . . . "Dinny said"

---

[95] 2d Supp. CR Vol. I p. 209-10.

. . . "According to Dinny's testimony" . . . and "Dinny told the court."[96]  Where the two passages in Statement 28 appear on page 78 of the Book, the author again signals that he is referring to Shah's testimony:  "According to Dinny" . . . and "Dinny recalled that."[97]  Just as the immediate context makes clear that the author is relying upon disputed testimony, the broader context reiterates time and again that Shah is a "perjurer" and "habitual liar," and that the jury ultimately sided with the Johnsons rather than Shah.

Appellants likewise ignore context in excising statements that referred to Joan.  Appellants characterize Statement 31 as describing Joan as a "borderline alcoholic" without noting the complete context:

> After all, **Joan was a borderline alcoholic abuser** <u>according to Dinny, although there is not much direct evidence to support that</u>.[98]

Statement 30 challenges a passage at page 63 of the Book which quotes testimony, but includes only the question of Shah's defense counsel.  The Book continues to include Joan's immediate denial:

> Attorney:  And you've also had problems with substance abuse, correct?
> Joan:  Never.  No, that is very incorrect.[99]

---

[96] 2d Supp. CR Vol. I p. 96.

[97] 2d Supp. CR Vol. I p. 97.

[98] 2d Supp. CR Vol. I p. 160.

[99] 2d Supp. CR Vol. I p. 82.

When these statements are fairly placed in context, the impression conveyed to the reasonable reader is that Shah's claims of substance abuse were more unbelievable fabrications by a habitual liar, attempting (unsuccessfully) to shift blame from himself.

### (2) Fair Report.

The statements about drugs and alcohol are a fair report of the trial record. Statement 28 says that Shah testified that Wirt drank heavily, and that is a fair account of Shah's testimony: "I know he [Wirt] was drinking a lot."[100] "[Wirt] continued to drink very heavily."[101] Shah testified that Wirt sent the gardener to buy a keg of beer for parties with his friends.[102] Shah testified about beer cans littering Wirt's apartment, and that Wirt was smoking marijuana.[103] David Collie also testified that he warned Joan about Wirt's excessive drinking:

> A. [David Collie] [Wirt] had some parties, and at the parties he had alcohol. I told Mrs. Johnson of the liability problem with that, of having alcohol at a party. I told her, "when you and I were growing up you could drink and drive but today that's not possible." I don't mind Wirt having parties. It's great that he does. But serving alcohol and then kids leaving and having an accident, I said, "Mrs. Johnson or Joan, you could be opening yourself up to a major lawsuit."[104]

---

[100] 2d Supp. CR Vol. III p. 1251:20-21.

[101] 2d Supp. CR Vol. III p. 1417:10-13.

[102] 2d Supp. CR Vol. III p. 1302:7-25.

[103] 2d Supp. CR Vol. III p. 1422:2.

[104] 2d Supp. CR Vol. IV p. 1913:11-19.

47

Joan noted that Wirt drank beer on his application to boarding school.[105] Before he was sent to boarding school, Wirt was frequently tardy or missed class, which Joan attributed to his keeping late hours and partying to excess.[106]

The Book's scant references to Joan's drinking alcohol are also a fair report of the trial record, especially considering that they are immediately juxtaposed by Joan's denial,[107] and the author's editorial comment that "there is not much direct evidence to support" Shah's claims of alcohol abuse.[108] Shah describes meeting Joan Johnson at a party where "they were drinking wine and socializing."[109] Shah's testimony later described Joan's circle of friends as "social people, drinking people."[110] Joan herself listed a family history of alcoholism on Wirt's boarding school application.[111] David Collie testified that he twice attended Alcoholics Anonymous meetings with Joan.[112]

Placed in full context, the challenged statements regarding alcohol or drug use are clearly references to disputed trial testimony, and are a fair report of the trial record.

---

[105] CR Vol. 3 p. 1137.

[106] CR Vol. 3 p. 2848.

[107] 2d Supp. CR Vol. I p. 82.

[108] 2d Supp. CR Vol. I p. 160.

[109] 2d Supp. CR Vol. III p. 1246:9.

[110] 2d Supp. CR Vol. III p. 1484:19.

[111] CR Vol. 2 p. 1134.

[112] 2d Supp. CR Vol. IV p. 1893:4-16.

**D.      "Parental Neglect Gist."**

Appellants identify seven statements (Statements 33 – 39) which they claim defame Joan as a neglectful parent.   In every case, these passages either are unverifiable characterizations, or when read in context, are either a fair report of the trial record, or not capable of the defamatory meaning that Appellants impute to them.   More to the point, to the extent the "neglectful parent" characterization imputes verifiable facts, it is hard to see how any reasonable reader could find it to be substantially false.

**(1)      Not objectively verifiable.**

Whether the children were "starving for attention" (Statement 34), or "spoiled" (Statement 36), or "trapped" (Statement 37), or whether the house was "a mess," all fall within the category of unverifiable characterizations.   It is not possible to prove or disprove that a child is "spoiled" or "trapped."   Moreover, almost every characterization is accompanied by references to the trial record giving the reader a reference to the testimony supporting the author's characterization.   Where the facts or testimony supporting a characterization are set out in the text itself, allowing readers to evaluate the facts and form their own conclusions, the characterizations are not actionable.  *Vecchio v. Jones*, 2013 WL 3467195 * 8 (Tex.App.—Houston [1st Dist.] 2013, no pet.); *Rehak Creative*

*Servs., Inc. v. Witt*, 404 S.W.3d 716 (Tex.App.—Houston [14th Dist.] 2013, pet. denied).

Whether Joan's "neglect" enabled "abuse" of her children is likewise inherently unverifiable—a subjective characterization rather than a provably false fact. "Neglect" has been held to be an unverifiable opinion. *Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 642-3 (Tex.App.—Fort Worth 1998, no pet.) ("patient neglect" at nursing home is an unverifiable characterization). "Abuse" has also been held to be an unverifiable opinion. *Falk & Mayfield, L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) ("lawsuit abuse" is unverifiable; "the accusation is derogatory and disparaging, but this is no different than saying one is ugly, scurrilous or disgusting"); *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 84 (Tex.App.—Houston [1st Dist.] 2013, pet. denied) (characterization of "elder abuse," while "a strong choice of words," held not actionable). Whether Joan's neglect enabled Shah's abuse of her children was an integral part of the Plaintiffs' own case. More fundamentally, it is an "individual judgment that rests solely in the eye of the beholder." *Molzan*, *supra*, at 824; *Vice v. Kasprzak*, 318 S.W.3d 1, 22 (Tex.App.—Houston [1st Dist.] 2009, pet. denied).

### (2) Fair report.

To the extent the challenged statements present verifiable facts, these are privileged as a fair report of the trial record. Statement 33, for example concerning Shah's testimony that Joan's house was "a mess," is the same as Statement 14, and supported by the same trial testimony.[113] Statement 34 is another glaring example of distorted context (with Appellants' redaction in bold):

> It seemed, <u>according to Dinny's testimony</u>, that **the house wasn't the only thing that Joan had neglected: Seth, Kaleta, and even Wirt were starving for attention.**
> <u>Some of Dinny's more outrageous claims about the Johnson children were easily discredited.</u> During his 2008 civil trial, <u>Dinny testified</u> that Seth, who was nine years old in 1996, had never had a haircut in his life and didn't know how to eat with a fork. <u>Dinny would later change his story</u> when early photographs presented at the trial clearly show Seth supporting a freshly cropped head of hair.
> . . .
> <u>Dinny also claimed</u> that the children were not involved in sports of any kind when he arrived on the scene, and he credited himself with getting the children interested in athletics. It was because of his encouragement, <u>Dinny told the Court</u>, that Kaleta joined her school track team. And, <u>he continued</u>, Seth had absolutely no interest in sports until Dinny signed him up for baseball. <u>Dinny said</u> he often drove Seth to practice, and initially he nearly had to force Seth out of the car.
> <u>In truth</u>, Seth had been involved in little league baseball for years before Dinny arrived on the scene <u>and Joan had the pictures to prove it</u>. Photographs from 1994 show a smiling Seth dressed in his Post Oak Little League uniform, clutching a baseball bat.
> In the picture, Seth's hair is neatly groomed.
> . . .
> It's very likely that Dinny really did encourage the Johnson children to go outside and play occasionally; **it's even plausible that, in her**

---

[113] CR Vol. 2 pp. 1183-1190.

**grief, Joan had become less proactive about taking her kids to various practices and games.** But Dinny's testimony that Seth and Kaleta were completely inactive prior to his arrival was an exaggeration at best.[114]

The Book tells the reader, *ten times* on two pages, that the author is referring to Shah's trial testimony. The context alerts the reader how Shah's testimony is unreliable when he gets caught in lies. The complete context includes the author's editorial judgment that Shah is not to be believed: his "more outrageous claims" are "easily discredited," and his other characterizations are "an exaggeration at best."

Statement 36 challenges Shah's characterization that the Johnson children were "spoiled." This passage includes a reference to Shah's testimony that the kids cried, threw tantrums, and that Kaleta once threw a fit when Shah would not buy her books she wanted. Selective editing again distorts the context:

> **According to Dinny, Kaleta's tantrum was proof that she was a spoiled brat, used to getting everything she wanted. And there may be some truth in that; after all, Kaleta had grown up surrounded by fabulous wealth.** But as every parent—rich or poor—knows, all children throw fits from time to time when they don't get what they want, whether it's a new video game, a pair of shoes, or a stack of books.[115]

The reasonable reader understands that this passage is describing Shah's testimony, and is reminded in context these behaviors are not defamatory, but behaviors

---

[114] 2d Supp. CR Vol. I pp. 83-84.

[115] 2d Supp. CR Vol. I p. 89.

typical of every child, rich or poor. And the passage is a fair report: Shah did testify that Kaleta threw "a tantrum" when he would not buy all of the books she wanted.[116] Joan herself described Wirt as "a spoiled brat" in his boarding school application.[117]

Statement 38 assails two characterizations in the Book where David Collie cited "parenting lapses" as a reason for breaking off his relationship with Joan.[118] Collie did testify that Joan was "setting a bad example" in telling Seth to return a toy without confessing that he took it.[119] Statement 39 criticizes the Book's rhetorical question of Shah's version of events: "Was Joan Johnson really the neglectful, uncaring mother that Dinny claims she was?"[120] But if any characterization in the book is privileged as a fair comment, it is the rhetorical question as to whether Joan was "neglectful" or "suffered parenting lapses." By her own admission, Joan watched her children endure physical abuse "on a constant basis" for two years.[121] She saw Shah assault Kaleta and Seth "many times."[122] She witnessed Shah beating Seth at a backyard barbeque in June 1998,

---

[116] 2d Supp. CR Vol. IV p. 1573-74.

[117] CR Vol. 2 p. 1134.

[118] 2d Supp. CR Vol. I p. 162, 180.

[119] 2d Supp. CR Vol. IV p. 1891:2-17.

[120] 2d Supp. CR Vol. I p. 270.

[121] 2d Supp. CR Vol. V p. 2193-2195.

[122] 2d Supp. CR Vol. V p. 2235:20-2236:9.

53

two years before opening her home to him.[123]  She endured Shah and Collie beating her in front of her children.[124]  She endured Shah hitting Seth resulting in a CPS call to their home in 2001, without telling the CPS case officer the truth.[125] She allowed Shah to lock her and Seth in their garage and refused the opportunity to leave when her yard man unlocked the door.[126]  She gave over $1.2 million to Shah knowing it was to her family's disadvantage.[127]  She made Shah and Collie the executor of her estate, knowing that it was not in her children's best interests.[128] After the beatings began, she repeatedly designated Shah the guardian of her minor children,[129] and named Shah and Collie as their godfathers.[130]  During this time, she had access to multiple attorneys, at least one CPA, other advisors, and CPS case officers who talked to her in her home, yet she never reported one incident nor made one complaint.  She testified—under questioning by her own attorneys—that she did this out of fear, terrified for retribution that Shah would exact.[131]  The Book

---

[123] 2d Supp. CR Vol. V p. 2174:25-2175:23.

[124] 2d Supp. CR Vol. V p. 2179:22-2181:3.

[125] 2d Supp. CR Vol. V p. 2195:13-2198:5.

[126] 2d Supp. CR Vol. V p. 2198:6-24.

[127] 2d Supp. CR Vol. V p. 2145:20-2148:1; CR Vol. 3 p. 2845.

[128] 2d Supp. CR Vol. V p. 2174:4-20.

[129] CR Vol. 3 p. 2855; CR Vol. 3 pp. 2673-85; pp. 2727-44.

[130] CR Vol. 3 p. 2687, p. 2860.

[131] 2d Supp. CR Vol. V p. 2191:2-6; p. 2198:1-5; p. 2199:2-12.

not only accurately reports her claim that she was terrified of Shah,[132] the Book also offers the explanation that Joan's behavior could be attributed to the "well documented" psychological effects of battered women syndrome, or Stockholm Syndrome.[133] "When Joan's behavior is viewed in this light, perhaps many of the things she did or did not do to protect Seth and Kaleta are understandable."[134]

Given all of the unchallenged admissions in the Shah Trial record, the rhetorical question as to whether Joan was "neglectful" is certainly a fair comment, a fair report, and a thoroughly justifiable opinion based on the record.

### E. "Child Abuse Gist."

Appellants complain of passages in the Book (Statements 46 – 64) which accuse Joan of failing to protect her children from Shah's abuse. Joan's undisputed failure to act was very clearly a recurring point throughout the entire trial. It is an observation that is certainly privileged as a fair report. Moreover, the fact that Joan failed to protect her children is substantially true.

### (1) Fair report.

Statement 46 describes the final assault on Joan and Kaleta the night Shah was arrested. The Book recounts that Shah beat Joan in the driveway, after which

---

[132] 2d Supp. CR Vol. I p. 212.

[133] 2d Supp. CR Vol. I p. 213, 234, 281.

[134] 2d Supp. CR Vol. I p. 281.

she simply followed Shah into the home, and did nothing while she heard Shah

beating Kaleta.[135]  This is a true account of Joan's testimony:

A.  [Joan Johnson]  . . . I remember when I got out of the car—I was in the back.  Suddenly I just—I yelled because the defendant had hit me very hard in the back and knocked a lot of air out of my lungs and it made a big sound, a big.  . . .  my bag fell on the floor, on the ground.

. . .

A.  He picked it up and he started beating me over the head with it, and he also kicked me here in the thighs.

. . .

A.  And they all three disappeared into the house.  I picked up my purse and the things that had come out and on the driveway that I could see, it was dark, and I followed them into the house.

Q.  Ms. Johnson, why didn't you call the police?

A.  How?

Q.  911.

A.  I would not have done that because I think—at the time I felt that the consequences of calling 911—I couldn't control these men.

. . .

A.  I heard lots of yelling in Kaleta's room, men yelling and Kaleta screaming out in pain.  I went into my room . . .[136]

The Book's account of Shah's assault tracks Joan's testimony directly.  Joan did

follow Shah into the house after the driveway assault.  Joan could hear her

daughter screaming.  But she did not help or call 911.  It is certainly a fair

---

[135] 2d Supp. CR Vol. I p. 24-25.

[136] 2d Supp. CR Vol. V p. 2214:9-2216:11.

comment to question why, and to ask whether a mother's inaction is "reasonable," or "mysterious" in horrific circumstances.

Almost all of the statements in the "child abuse gist" are variations on the same theme: why Joan failed to protect her children, or failed to act, or could not blow the whistle. All of these observations are privileged as a fair report of the trial and fair comment on matters of public concern.

### (2)    Not substantially false.

The fact that Joan failed to protect her children is also substantially true. Plaintiffs called several witnesses who testified to precisely that observation, often in the same words. Houston Police Officer PD Nguyen was struck by the fact that Joan failed to protect Kaleta:

> A.    [Officer Nguyen]  She said that Kaleta went into her room, Dinesh Shah followed her, went to Kaleta's room, and all she could hear was her daughter screaming.  And I asked Mrs. Johnson, "Well, if you hearing your daughter screaming, ma'am, **why didn't you go in there and try to protect her**?" She said she was just too afraid of Mr. Shah.[137]

Sergeant Kenneth Bounds was called by the Plaintiffs to testify to the same effect:

> A.    [Sergeant Kenneth Bounds]  It was just obvious that something was, something bad was going on in that house because—Mrs. Johnson, you know, was trying to cover for him [Shah] initially, **which goes against everything I have ever seen about a mother protecting a daughter**.  And I wanted to see—it was, obviously, they were terrified of this guy.[138]

---

[137] 2d Supp. CR Vol. II p. 764:6-14.

[138] 2d Supp. CR Vol. II p. 797:6-12.

57

The Johnsons also called Dr. Victor Scarano, a psychiatric expert, to explain why Joan failed to protect her children.

> Q. And how would you characterize [Joan's] behavior?
>
> A. [Dr. Scarano]  Well, I'd have to go through how it all developed but it, you know, it has to do with who she was, where she grew up, things that happened in her life prior to the entrance of Mr. Shah into her life and Mr. Collie, and the things that occurred after that that **caused her to be in a situation where she was unable to protect her children.**[139]

Appellants called another medical expert, Dr. Arthur Farley, who testified that Joan's inaction contributed to her children's abuse.  Farley testified that understanding an abusive relationship was like "trying to peel an onion," prompting this follow-up exchange:

> Q. What's at the heart of this [o]nion, Dr. Farley?
>
> A. [Dr. Farley]  Abuse.
>
> Q. By whom?
>
> A. **By Mr. Shah and Mrs. Johnson.**[140]

When the Book reports the characterization that Joan failed to protect her children, it is literally repeating testimony from the Plaintiffs' own witnesses—two police officers, two medical experts, and the Johnsons themselves—all of whom shared a

---

[139] 2d Supp. CR Vol. IV p. 1874-75.

[140] 2d Supp. CR Vol. V p. 2380.

subjective evaluation that is both an individual judgment, and a conclusion almost impossible to deny.

Importantly, the context of the Book includes Joan's explanation that she failed to act out of fear, and that the "well-documented" condition known as battered women's syndrome likely explained her predicament.[141] Joan admitted that she witnessed Shah physically assaulted her children "many times" over a period of years: "it was really getting bad. I was really afraid of him in 2002. He was getting very, very scary."[142] Joan's own lawyer commented on her inability to protect her children: "If he's beating your children, you are supposed to do something, ma'am."[143] Joan's lawyers then developed her direct testimony to explain her inaction:

> Q. [Mr. Perdue] You're a grown woman. You have young children. There is violence all around. **Why didn't you make an effort to stop it?**
>
> A. [Joan Johnson] **I couldn't figure out how.** You see, when there is that much, when the threat of violence and you are that scared and you have two other, you're not by yourself, I had two children to think about.[144]

The Johnsons' psychiatric expert, Dr. Scarano, was asked by Joan's lawyers to comment on "Stockholm Syndrome:"

---

[141] 2d Supp. CR Vol. I p. 281.

[142] 2d Supp. CR Vol. V p. 2236.

[143] *Id*.

[144] 2d Supp. CR Vol. V p. 2182.

A.     [Dr. Scarano]   Stockholm Syndrome is a very interesting syndrome named after a bank robbery in Stockholm where two robbers entered a bank and the individuals that were there through the entire incident became, as a survival mechanism, became associated with the abusers, the robbers themselves, and in fact tried to—one of the women after the thing was over and he was arrested, one of the robbers was arrested, went out to raise money for him.  So it's a survival mechanism in which those people who are abused become affiliated with the abuser.

Q.     [Mr. Clote]  Do you have an opinion about whether or not that occurred in this case?

A.     Certain elements of the Stockholm Syndrome are present in this case.[145]

The Book's account of Joan's failure to protect her children is certainly a fair report, where the Plaintiffs themselves offered so much testimony to explain her inaction.  Again, the Book includes Joan's testimony that she was terrified of Shah because of death threats,[146] the fact that she likely a victim of battered women's syndrome,[147] that the entire family was probably bound to Shah out of fear based on Stockholm Syndrome,[148] and that all of these psychological factors made her predicament understandable.[149]  This is a fair account of the trial.

---

[145] 2d Supp. CR Vol. IV p. 1875:4-19.

[146] 2d Supp. CR Vol. I p. 212.

[147] 2d Supp. CR Vol. I p. 213.

[148] 2d Supp. CR Vol. I p. 234.

[149] 2d Supp. CR Vol. I p. 281.

Statements 48 and 49 are passages questioning why Joan would sign powers of attorney granting Shah and Collie authority over Joan and her children.[150] These statements describe Joan's actions as "ill advised" and "inexplicable." These are unverifiable characterizations, but again, they are accurate and privileged observations based on the trial record, and to the extent that they connote verifiable matters of fact, they are certainly true.

The Johnsons introduced 16 exhibits in which Joan granted powers of attorney or guardianships in favor of Shah over herself, her brokerage accounts and her children. Joan signed multiple documents appointing Shah guardian of Seth and Kaleta.[151] Joan signed a durable power of attorney in favor of Shah over the affairs of Seth and Kaleta, and a special power of attorney over Seth when he went to school in Connecticut.[152] She signed three statutory durable powers of attorney in favor of Shah or Collie, including one which appointed Shah and Collie as guardians for Seth and Kaleta.[153] She signed six powers of attorney giving Shah and/or Collie authority to trade in her Merrill Lynch accounts.[154] She signed two medical powers of attorney giving Shah authority to make her personal health care

[150] 2d Supp. CR Vol. 1 p. 117-119.

[151] CR Vol. 3 pp. 2673, 2682-85, 2739, 2807, 2855.

[152] CR Vol. 3 pp. 2727, 2742-44.

[153] CR Vol. 3 pp. 2682-85; 2689-92; 2729-31.

[154] CR Vol. 3 pp. 2676-80; 2700-25.

decisions.[155]  She designated Shah and Collie as godfathers for Seth and Kaleta.[156]

Almost all of these documents were signed by Joan after the violence had begun,

including an incident where Shah abused Joan on a trip to California in 1999,[157]

and an incident where Shah again assaulted Joan on a trip to New York.[158]  It is

certainly a fair comment to wonder aloud if this behavior is reasonable, explicable

or mysterious.

Passages in the Book which observed that Joan also failed to protect her

family's finances are likewise a fair report, and are undeniably accurate.  Joan

gifted Shah $1.2 million in a bizarre document that also has Joan assume the gift

tax burden, and which the Book describes as almost certainly the product of Shah's

undue influence.[159]  The Johnsons offered evidence that Shah had talked Joan into

transferring $2.5 million to him in gifts of stock and cash over four years.[160]  Joan

indemnified Shah and Collie from any loss they might incur in their "consulting

services" to her.[161]  Shah also had Joan document a substantial number of "gifts" to

him, including, inexplicably, many guns.[162]  It is both fair and accurate, and a

---

[155] CR Vol. 3 pp. 2694-98; 2733-37.

[156] CR Vol. 3 pp. 2687, 2860.

[157] 2d Supp. CR Vol. V pp. 2179:15-2181:3.

[158] 2d Supp. CR Vol. V pp. 2181:24-2182:11.

[159] CR Vol. 3 p. 2845.

[160] CR Vol. 3 p. 2783.

[161] CR Vol. 3 p. 2746-48.

[162] CR Vol. 3 pp. 2799-2803; 2828-30.

substantial understatement, to say that these transfers were not in the Johnsons' best interests.[163]

Appellants challenge a number of other statements as accusations of child abuse. In every case, these are again fair accounts of the trial record. Statements 56 and 57 question whether Joan believed or disbelieved allegations that David Collie may have abused one of the children. Statement 52 concerns a passage in which Shah believes Joan "cooked up" a false accusation of abuse in order to trick Collie into marrying her. Joan noted in her diary that Wirt had made a false accusation that David Collie molested Seth.[164] The diary also speaks of Joan's wish that Collie would marry her, and her fear that he will not.[165] Collie testified that Wirt made a false accusation of sexual misconduct, but that Joan never believed it.[166] Finally, the trial record includes Joan's statement that she raised a false accusation against Collie of sexual misconduct with Kaleta to entrap Collie

---

[163] Appellants argued below that their written statements were coerced by Shah and therefore unreliable. But the Book endorsed that view repeatedly: "it is very likely that many of the Johnson family's personal letters and affidavits were the result of Dinny's coercion." (Book p. 140). A statement that the plaintiff falsified reports is substantially true even though the plaintiff claims he was coerced into signing them. *Louis v. Mobil Chem. Co.*, 254 S.W.3d 602, 610-11 (Tex.App.—Beaumont, pet. denied). And an accurate account of disputed testimony remains privileged even if that testimony is recanted or disproved. *Pardo v. Simmons*, 148 S.W.3d 181, 192-3 (Tex.App.—Waco 2004, no pet).

[164] CR Vol. 3 p. 1828 (DX 343).

[165] *Id.*

[166] 2d Supp. CR Vol. IV p. 1930:6-24.

into marriage.[167] Joan testified emphatically that the disputed document was a lie, coerced by Shah and signed by her only because she wished "to avoid more violence."[168] Shah testified that the whole event was an overreaction to one occasion when Kaleta jumped in Dave's lap.[169]

In sum, the passages that question Joan's failure to protect her children, and her failure to protect her family's financial interests, are well-substantiated in the trial record, including the testimony of the Appellants' own witnesses, and they are certainly a fair comment on matters of public concern.

## V. Appellants' other claims are waived.

In addition to the five "defamatory gists" listed in their Brief, Appellants raised four more "defamatory gists" in the trial court below: an "inappropriate behavior" gist, a "learning disabilities" gist, a "behavioral problems" gist, and a claim for defamatory statements about other members of the Blaffer family.[170] Appellants also brought non-defamation claims: invasion of privacy, infliction of emotional distress, theft and conversion of their documents, aiding and abetting, ratification, and a claim for injunctive relief.[171]

---

[167] CR Vol. 3 p. 2853 (DX 15).

[168] 2d Supp. CR Vol. V pp. 2189:1-2191:6.

[169] 2d Supp. CR Vol. III pp. 1313:14-1314:24.

[170] CR Vol. 3 pp. 3212-13; 3256-3261; 3271-3290.

[171] CR Vol. 1 pp. 169-178.

The trial court granted Appellees a take-nothing summary judgment on all of Appellants' claims.[172] In this Court, Appellants only briefed the five defamatory gists described above. Appellants do not argue, brief, or assign any error on the other causes of action. A finding or judgment not challenged on appeal is waived. *Jacobs v. Satterwhite*, 65 S.W.3d 653, 655-6 (Tex. 2001); *Swank v. Sverdlin*, 121 S.W.3d 785, 797 (Tex.App.—Houston [1st Dist.] 2003, pet. denied), *cert denied*, 544 U.S. 1033 (2005). Points not raised in the brief will not be considered for review. TEX. R. APP. P. 38.1(f), (i); *Escobar v. Harris County*, 442 S.W.3d 621, 641 n. 12 (Tex.App.—Houston [1st Dist.] 2014, no pet.); *Bob v. Cypresswood Community Ass'n*, _____ S.W.3d _____, 2015 WL 3423753 at * 3 (Tex.App.—Houston [1st Dist.] 2015, no pet.).

## CONCLUSION

Appellees pray that the Trial Court's summary judgment be in all respects affirmed.

DATED and FILED this 18th day of September, 2015.

---

[172] CR Vol. 4 p. 3780.

OGDEN, GIBSON, BROOCKS,
LONGORIA & HALL, L.L.P.

By: /s/ William W. Ogden
    William W. Ogden
    State Bar No. 15228500
    bogden@ogblh.com
    Judith A. Meyer
    State Bar No. 13993200
    jmeyer@ogblh.com
    1900 Pennzoil South Tower
    Houston, Texas 77002
    Telephone: 713-844-3000
    Facsimile: 713-844-3030

    Attorneys for Appellees

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Appellees' Brief has been prepared using Microsoft Word 10.0 computer software with the body of the brief in Times Roman 14 point typeface, and footnotes in 12 point typeface. Excluding those parts of the brief not counted by TEX. R. APP. P. 9.4, this brief contains 14,887 words.

/s/ William W. Ogden
William W. Ogden

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of the First Court of Appeals using the electronic case filing system of the Court. I also certify that a true and correct copy of the foregoing Brief was served on the following counsel of record for appellants via e-service on September 18, 2015.

Marc S. Tabolsky
YETTER COLEMAN LLP
Two Houston Center
909 Fannin, Suite 3600
Houston, Texas 77010

Mr. Patrick Zummo
LAW OFFICE OF PATRICK ZUMMO
Two Houston Center
909 Fannin, Suite 3500
Houston, TX 77010

*/s/ William W. Ogden*
William W. Ogden